I didn't mean that question. Anyhow, you're going to tell us that you are David Satouchne, is that correct? Yes, Judge. I'm David Satouchne on behalf of the plaintiff, Tamika Covington. If I can request, Your Honor, just three minutes on rebuttal. Okay. So, Ms. Covington is a high school and junior high school basketball official. She's been that for over a decade. We know the facts, and we haven't conferred on this. It may well be, at least only to my way of thinking, it may well be that there is a complaint stated, a cause of action stated against the Board 193 as an employment agency and against the schools as the payer or the employee. But as to all the other folks that you've dragged into this lawsuit, help me understand how in the world you're getting them under this claim. We also have a claim against the New Jersey Association as a direct employer for postseason games. Do they issue the checks for postseason games? They do. All right. So, Board 193 makes all the assignments for regular season games, and then after the regular season, there's a postseason tournament, and that's totally operated and managed and controlled by the New Jersey Association, which assigns and imposes various rules on and pays the officials for those season games. So, their function is the Hamilton School District for postseason games? Exactly right, Judge. Now, there's no actual – I looked. I thought there was, and I went back again, and there was – there's no rule that says it has to be a male official, right? No. No, there's no such rule. I mean, we would – There's no express thing. So, you're relying on pattern and practice? Yeah, we're relying on the actual fact that Ms. Covington has – well, for regular season games, has almost never been assigned to a men's varsity game, although she's well qualified to handle such games. They don't claim she's not qualified. That is their defense, actually. Their defense is a factual defense, that she is just not as good as the male officials. I didn't see that in their brief. Well, maybe we're not at that point yet. We haven't seen that in the brief because this was decided on the pleadings, all right? So, the parties have engaged in extensive discovery, which the parties are privy to, but the court is not and is not part of the record. Why is the Hamilton Board of Education the only school defendant in the case? Did she only officiate in the Hamilton Board of Schools? No, no, Judge. It wasn't the only school. It was a major school that Board 183 assigns to. I don't have a really good answer for that. That was a decision made by the – 193, by the way. Board 193, did I say? I'm sorry. No, you said 183. I apologize. The initial parties were brought in by my predecessor at council, and he only named the school – One school district. One school district, yes. What about Colonial Valley Conference? Yeah. Do you concede they should not be in this case? I mean, you didn't make any argument at all in your brief. We made arguments in our initial brief. We didn't make arguments in our reply brief. Certainly, certainly – I have the same trouble hearing you. I can't figure out – I can't conjure up a theory of liability against them. Judge, certainly – I couldn't either. Certainly, I guess the theory that they were brought under is that they're essentially kind of a co-employer, like the school district itself, all right? The school is a member of that conference, along with other schools, and that the conference and the schools run these games together, essentially. That's the theory that I think they were brought under initially, and that's the theory that I pursued in my papers. Do I think it's my strongest theory? Frankly, not. And I think Your Honors might have picked up on that in relieving their counsel from arguing in this case. But Your Honor also asked me what were the other theories of liability. So we talked about the direct liability for postseason games of the New Jersey Association. But then we also brought in the New Jersey Association and AIBO the International under a principal agency theory for regular season games, essentially that Board 193 is an agent of those two associations, the New Jersey Association and AIBO International, with respect to the assignments of officials to regular season games and that they're liable under a principal agency relationship. And that type of liability was found for the Pennsylvania Association in the Chemether cases. AIBO the International wasn't a party in the Chemether case, but that was the theory. So in the Chemether case, the Pennsylvania Association was found directly liable as an employer for postseason games, just like we're seeking here. But AIBO is a huge, I had no idea it was this big, it's a huge organization, it's a worldwide organization. Over 200 member schools, if you pled, maybe rephrase it, where have you pled the kind of direct relationship or involvement you'd have to against them to get them within the umbrella of your complaint? With respect to AIBO the International? Correct. Okay. So AIBO International is an association that, well, let's put it this way. First of all, Board 193 is what's called a local area board of AIBO. That's the most direct defendant, isn't that right? I'm sorry? 193. Yeah. Isn't that the most direct defendant? For regular season games, that's correct, Your Honor. They are the most direct defendant. And the theory for, the principal agency theory for the association and for AIBO the International for regular season games came out of the Chemether case, because that was a theory of liability that was sustained by the judge after a jury verdict. Was it based on the dues primarily that she pays to AIBO? She pays dues to AIBO. She pays dues to the association, and I believe she pays dues directly to Board 193. Are you hinging all of the theory of liability asked to AIBO on the fact that she pays dues? No, that's not it, Your Honor. I guess I'll go through the facts that we allege in the second amended complaint with respect to AIBO the International. And that is, so the AIBO bylaws require Ms. Covington to be a member of a local area board, in this case, Board 193. Conversely, in order to be a member of Board 193, she has to be a member of AIBO. But the policy that you're focusing in on, is there anything that you're alleging that ties AIBO to that discriminatory policy? Other than the fact she pays dues to AIBO, there's clearly a connection between AIBO, 193, and the local basketball organizations. I guess the theory rests on the level of control that AIBO International has over Board 193. As to what? As to the policy you're challenging. Not as to the training of the officials or the other things you have in your complaint. As to the particular policy, I'm trying to figure out what is it that puts AIBO on the hook for those policies. And their qualifications? I'm sorry, Judge? And their qualifications, question mark, to add to the things Judge McKee just said. Judge, I guess the theory is that Board 193 is essentially an extension of AIBO, AIBO International. How is this different than an international union and a local union when there's a discrimination complaint against the local union? You're saying under those circumstances, the international is liable as well because the local is an extension of the international? Under certain circumstances, yes. There's certain aspects of control here where, for example, AIBO retains the power to discipline any member of Board 193. If Board 193 suspends or expels any member, that member can appeal that to AIBO International. The AIBO bylaws provide that a member of a board that is charged with a violation of the board constitution will get a hearing from AIBO International. So essentially, if Ms. Covington wants to make an appeal of a decision by, if she gets expelled by Board 193, she can appeal that decision to AIBO International. Has she raised this particular complaint to AIBO? She did not, Your Honor. She did not. She did not make any complaints outside of Board 193. Is there any allegation that AIBO is even aware of this practice? There is not. Okay. There is not. Not in the sense that there's a specific AIBO individual or an AIBO representative that knows specifically what type of assignments were made. Right. And there's no written policy here. It's kind of an old boys' network assignment. And you have to be a male referee, a male's game, it's the culture, and that's how the assignments are made. But you're not alleging anything to say that AIBO, especially since they're worldwide in your complaint, that AIBO isn't aware they're over in New Jersey. These folks have this discriminatory practice going on. That's true, Your Honor. That's true. So, I mean, I wouldn't contest that. All right. So it's a theory based on essentially of that AIBO, that Board 193 is aided through its agency relationship. It's a sticky fingers theory. Yes. You touch it and you're stuck with it. Yes. Yes. All right. And that Board 193 couldn't engage in this discrimination without its affiliation and relationship with AIBO the international. Well, it couldn't do anything without its affiliation. Yes. Yes. All right. So is it like an extension? Well, even after extensive discovery, the relationships between all these parties are somewhat mysterious, all right? You have had extensive discovery. Yes. Yeah, we've engaged in extensive discovery. So AIBO, essentially from my understanding, takes responsibility for all training aspects. It's a training organization. And to be an official for Board 193, you essentially have to have the stamp of approval of AIBO international. And Board 193 essentially follows the AIBO international's training and evaluation. How does it train? How does it train? Yeah. I mean, it has rules, I guess, that say, you know, what you're supposed to do. Yeah, I think it has, like, different training, like, actual, like. I mean, do they have, like, schools? Or do they have, you go for six weeks, or you go for a week? Or how do they do this? Well, I think they have training meetings. Like, for example, they have AIBO people come in and give presentations about training and so on and so forth. And this is the way you're supposed to call this foul, that sort of thing? Yes. Yes, exactly. So, and I believe that also all the board members have to take a test that's sponsored by AIBO. Or NJSA. I'm a little fuzzy on that as I speak right now. But so, but the theory with respect to AIBO international is really one of aiding, all right, or being aided in the discrimination through the agency relationship. Well, how do they aid in the discrimination? Well, I guess in this way. I mean, do they not qualify women? Do they not say you're qualified? You mean AIBO international? Yeah. No. No, that's, they don't, there's no AIBO policy, international policy of not qualifying women. All right. So, it's the aid, the aid is. It's a very mysterious business. Secret handshakes and all. I mean, I figure that if you didn't allow African Americans to be officials. Yes. I mean, there would be a great roar. Yes. But if it's women, it doesn't matter so much. Well, that's what we're trying to remedy here. Yeah. Well, I hope so. Yes. She said neutrally. But, and what we're trying to get at, I think, is why. You know, I mean, leave aside the fact that women are discriminated against. But, you know, within this structure, where is the specific point at which they say no women? It's, well, it's, from our standpoint, it's with the individual defendant, who's the president of board 193, and the assigners that are assigned by the board, by him and by the board 193 council. All right. For regular season games. I'm sorry. For regular season games. For regular season games, right. And for the, and a lot of the same people play a role in the NJSI, in the New Jersey Association. You know, they have a lot of people come together and they make assignments. And as far as we know, not a single woman has ever been assigned a post-season varsity game. Are women involved in, I understand you're saying they can't, they're not assigned to rep games. Are they involved, so far as you know, and so far as maybe the allegation here doesn't come into play, are they involved in making the assignments? Are there any women on the board of 193? No. There's no female assigners. And you say not assigned any post-season games, but that's men's games or boys' games. Exactly. You're right, Judge. I mean, I always mean men's varsity games. That's what the lawsuit is about. So where is the point at which the discrimination is manifested? In not assigning? Yes. It's in the assigners. Yes. Yes, Judge. The assigners. The decision-makers as to who, which official gets to officiate at which games. That is made by the assigners. So what would happen if Ms. Covington got assigned? I mean, would more help arise? I mean, I'm trying to figure out who really controls. This is a question of control. And who really has the control? I mean, the assigners are many. It's not one person. For Board 193, there's been a series of assigners over a period of time. There's usually one or two assigners at any one period of time. So that assigns all the games for the regular season. And that person is put into his position by Fred Dumont and or the council members of Board 193. And so we allege that that person has, well, several, I mean, over time, it's been several people have specifically excluded Ms. Covington from officiating. Ms. Covington and other females. Yes. Yes. So, Judge, I see my time is out. Oh, no. Do you want to keep going? No, yeah, I think we should keep going. As long as there's some questions, go ahead. Sure, of course. I have a question. Sure. And that is, the Holmes, you rely on the Chemether case, the Eastern District decision, and there's the, I think it's Judge Sanchez's decision in Holmes, where he does not find this vicarious liability theory to hold much respect to the PIAA Pennsylvania counterpart to the New Jersey one with respect to assignments for basketball games. Why isn't Holmes persuasive? Well, because in Holmes, the assignments were made by someone who actually was not affiliated with either the leagues or the PIAA at all. The court found under that factual scenario, it was a person named Yost, that Yost was essentially acting independently, all right, and not on behalf of anyone except himself in how he was making assignments. So the court held that Yost wasn't acting on behalf of the leagues or that he was essentially paid by or being used by to make assignments. Let me take the Holmes case, though, and apply it at least with respect to the vicarious liability theory against the New Jersey Interscholastic Athletic Association. Right. How are the assigners here, agents of the New Jersey Interscholastic Athletic Association for regular season games? Well, I mean, here, unlike in Holmes, Yost was not an agent or acting on behalf of these leagues. Here, the assigners are clearly, are in fact acting, they're members of and acting on behalf of and appointed to their position as signers by the board, by Board 193. So if Board 193, if the signers here are members and acting on behalf of Board 193, then Board 193 is an agent of the PI, of the NJ Association. So that's the difference, all right. In Yost, he wasn't an agent of any local board that was an agent of the PIAA. Right. Here, the signers are agents of and acting on behalf of Board 193, which is an agent of the New Jersey Association based on all the levels of control and facts that we allege in the second amended complaint. I have one other question, too, if I may. Sure. And that is, is your theory then that a basketball official is an employee of each school district for each game they ref? Yes, Judge. Yes, it is. What do you want us to do? What do you think that we can practically do? We can't, I don't, can we say Chemether should apply or, you know, Judge Young, move Judge Young to New Jersey? I think what we're asking this court to do is to simply rule that the second amended complaint has sufficiently alleged plausible claims, a plausible claim against Board 193 under Title VII as an employment agency. Under Title VII. A plausible claim against the school board, Hamilton, as an employer, and has plausibly alleged that all the other school districts are also employers for purposes of Title VII. We ask that the court hold that we sufficiently at least alleged a plausible claim that the New Jersey Association is liable as a direct employer for postseason games. And we also ask that the court simply hold that we have sufficiently pled plausible claims against Ivo and the New Jersey Association for regular season games under this agency principle. Under Title VII. Under Title VII, yes. What about Title IX? So Title IX is against the school board itself, and Title IX prohibits discrimination by educational institutions that obtain federal funding, and we think that applies to the school board. So the judge initially, the trial court judge initially dismissed the Title IX claim on a prior complaint because there was no allegation that Hamilton obtained federal funds. We corrected that in the second amended complaint. We made that allegation, but the judge again dismissed that claim. Well, are you saying that Title IX and Title IX, the inquiry into Title IX and Title VII after the Hamilton School District are identical in that you asked whether or not either of them, well, put it, let me back up again. Are you saying that the inquiry under Title IX and Title VII against the school district is identical in that the second amended complaint survives the Trombi-Iqbal limitations as to the school district being either an employer or an employment agency? Is that what you're arguing? So I think the analysis is identical. The same. I'm not sure that under, I think the board might be liable under Title IX, even if Ms. Covington is not considered directly an employee of the board for games. I'm not sure if that analysis comes into it. Which board are you talking about, 193? I'm sorry, Judge, I keep confusing you and myself. I mean the school board. Yes, very much. All right. I mean, I will refer to them as Hamilton from now on. So I think Hamilton can be held liable under Title IX for discrimination in its use of officials, even if they're not formally considered employers. Or an employment agency. Just the fact they get the federal funds. But for Title IX, would you need to show that there's an actual policy in place at Hamilton to not have women officials referee voice games? A practice or policy, I believe. But they don't make the assignments. Well, they can – I mean, it's true that they use Board 193 for assignments, but they also have their own role to play. They can request specific officials. They can deny specific officials. And, you know, from our allegation is that there's essentially collusion, all right? at Hamilton and the other schools and the assigners at Board 193. So, I mean, they all play a role. So – but Title IX is an independent source of liability for Hamilton as opposed to any of the other individuals – any other defendants. Can you say some time for rebuttal? Yes. Thank you. Thank you. This could get a little confusing, but we let Mr. Santucci run over a little bit, so be mindful of the time because of the number of arguments. But obviously, since we let him run over, we can't – We'll be equal as to you, unlike your clients. Thank you, Your Honor. Joseph Turchy. I'm Joseph Turchy for the International Association of Basketball Officials. May it please the Court. Sure. Obviously, the Court has focused in on the issues relating to my client. The only claim here is that IBO somehow is the principle of Local 193. There are many problems with that theory. The first is, as you've already pointed out in the questioning of Mr. Santucci, there isn't one allegation in the Second Amendment complaint, there wasn't any in the First Amendment complaint or the original complaint, asserting that IBO has any role whatsoever in the assigning of officials. It simply does not. It is a large organization with lots of affiliates. Does it have influence? It has none, Your Honor, not in the signing because it's just not part of their business. The linchpin here, and you've also pointed this out with your arguments, is the basis of the alleged discrimination is that Ms. Covington claims she wasn't assigned. First of all, as I understand it, she was assigned some games. She's claiming that she wasn't assigned enough. It's not that she was never assigned any male games, though. She was assigned female games, girls games. She was assigned some male games, right? She was assigned some male games during the regular season. Okay. The fact of the matter is IBO qualifies officials, and IBO did qualify Ms. Covington and did qualify many other female officials. If they weren't qualified, they couldn't serve in any capacity, female or male games. So IBO's role ends at the qualification. But she's referring to some male officials, and the local schools for regular season games can either request certain officials or request that certain officials not be assigned to their games. But those requests are not made to IBO. Right. I understand that. I understand that. I'm just thinking that through because that's complicated, and I didn't pick up on that before. But as Judge Van Esky pointed out earlier, IBO is absolutely no different in the context of a Title VII claim than an international union would be. And the courts have ruled in – this court has ruled in a similar context that an international union can't be inferred to be the principal of a local union just because of the affiliation. You have to look at the business of both and see whether there's any control by the international over the local for what's involved in the alleged discrimination. Is IBO the seal of quality? Is it like that? For qualification, yes, but not for assignment. So IBO qualified Ms. Covington and many other female officials to be able to officiate in games. And so if she was qualified, then nobody could say that we didn't hire her because she wasn't qualified. Is that right? Well, I would assume that's correct, Your Honor, but I don't think that that is the defense of some of the other defendants in the case, that she wasn't qualified. She's qualified to be official once she puts that patch on her sleeve from IBO, where she wouldn't get any assignments at all. I think the issue is, was she selected over others who are more qualified? Did your brief say that she did? I don't remember reading that. It wouldn't have been my brief, Your Honor, because it's not our issue. Did somebody else's? Well, you read the others, too. I believe it is brief that she was assigned to some male varsity game. Her claim is that she should have been assigned to more because she's claimed she's better than some of the males who get more assignments. She may very well be. Pure statistics, she has to be better than some of the males. Again, Your Honor, from IBO's standpoint, it doesn't evaluate officials as compared to others. Once they're qualified to be officials, IBO's role stops. So they're qualified, they wear a patch on their sleeve, and as it relates to the only legal precedent that plaintiff cites to try and keep IBO in, the Chemether case, it's completely different. First of all, the principal, the Chemether court found the Pennsylvania Association to be the principal, not IBO. IBO wasn't a defendant in that case. And more importantly— And IBO would have been involved there, I assume. Excuse me, Your Honor? I assume that IBO would have been or could have been involved. It's an international— Sure. I assume the Pennsylvania— Pennsylvania, Jersey, every other state. Okay, yeah, sure. But they weren't in the case, but the clear distinguishing factor is in Chemether, it was after a jury trial, and there was a specific finding that the Pennsylvania Interscholastic Athletic Association had a rule not to evaluate a policy, not to evaluate women. And, of course, if they couldn't be evaluated, they couldn't be assigned. There's no allegation by the plaintiff in this case that IBO has any similar rule, has any rule at all as it relates to evaluation or assignment of officials. I would also suggest that another analogy would be the NCAA. The NCAA doesn't get sued in Title VII cases when a member school is sued for discrimination in the Department of Athletics. The NCAA— Well, you don't know that. Excuse me, Your Honor? It doesn't get sued. You don't know that it doesn't get sued. There aren't reported decisions about them getting sued, what I should say, as the principal of an alleged agent being the member school, but the affiliation is similar to this affiliation. The member schools all pay dues to the NCAA. They may not be called dues, but they pay to the NCAA. The NCAA is the governing body. The NCAA is the rulemaking body. They have a training and educational role. Not unlike IBO and its role on many, many other conferences and other local boards throughout the country. Okay, Mr. Jersey, thank you very much. Thank you very much. Good morning, Your Honor. Good morning, Mr. Watson. Please support Andrew Watson on behalf of IBO Board 193 and Fred Dumont. 193. I'll do my best to refer to Board 193 and not try to confuse any of the issues here. Okay. The district court in August of 2010 gave plaintiffs a full opportunity to come and amend its complaint. Gave a roadmap. Here's your free chance. Show us the facts here to keep these defendants in. 193 is the assigner, right? That's correct. And in that amended complaint, they're treated specifically. And do you generally assign, does 193 generally assign males to be the officials in boys' high school games, basketball games? There have been both men and women assigned to. And what percentage of women? I don't know if there's a quantification, Your Honor. You know of one? No, I do not know of a quantification in terms of the percentages. The percentage, if you take the universe of officials eligible to rough high school games in the state of New Jersey, what percentage of that universe, and I'm looking for, would be female and what percentage? Any idea? I don't know, Judge. I don't have those answers. I mean, we're dealing obviously with just the complaint. I understand that, yes. And the 1286 motion. And I do know, as plaintiff's counsel referenced, that extensive discovery was committed. But to cite chapter and verse, do you have any percentages? I simply don't have that information. Would it be fair for us to infer that you generally did not have females assigned to rough these games? No, I don't think that's a fair answer. He's alleged that, though. He's alleged that, and that's getting, I think, beyond. I mean, I have been to, I can't tell you how many years of college basketball, and I've never seen, men college, never seen a woman official. Have you? I don't go to that many college basketball games. I've been to lots. Actually, I go to the women's games. I follow the tendency. Lady Vols. I don't really follow men's basketball. And the Syracuse Warriors. Anecdotal evidence, my son, my oldest, he's a 12-year-old. He plays, and I go refs there, and he has female referees. Now, obviously, he's younger, but again, it's all anecdotal. I don't know if it does anything at all. If you can sit through a middle school basketball game, you're a better person than me. You're a very patient individual. So, again, we probably come with all of our own life experiences here, what we've seen, men or women. Probably two in hockey, too. Yep. That's a sport near and dear to my heart, and the fact that we don't have a season here is killing me. But the issue, obviously, is the second amendment complaint, at least from Board 193's perspective, and whether or not they are an employment agency. He's alleging that they assign, and none of this is disputed. Even if it were disputed, that's not the issue. And Rick Bon Twombly, he's alleging that Board 193 makes assignments of officials. He names the assignors or assigners. And he's alleging Board 193 has refused to assign Covington to boys' regular season games and assigns her only to girls' games. Now, probably there's some issue about that now, but we're looking at the complaint. And he's alleging that Covington has repeatedly complained about this, but Board 193 refuses to appoint her to boys' games. So there might be a lot of issues of fact lurking around as to why that is, and maybe she's the proverbial Homer, I don't know. But that's not really before us. The allegation that's before us is whether it complies with Iqbal and Twombly. And at least as to your client, I'm hard-pressed to find out why this does not survive in 12b-6 after Twombly and Iqbal. And that's because, Judge, in the first amendment complaint, they pled Board 193 as an employer, abandoned that theory, came up with an entirely new theory here in the second amendment complaint and said, Board 193 is an employment agency. Isn't that what the amendment complaint is for? It is. And he could have amended that complaint at any time during the course of discovery to add more facts. The key here is an employment agency requires the prerequisite. It's an underlying employer. So you have to analyze, plain as counsel has said, all these school boards are now employers. You have to analyze in those Darden and Kellen facts whether or not there's anything pled in that second amendment complaint to show that Hamilton Board of Education is indeed an employer. They made up the paychecks, don't they? They have two factors that they cite in their pleadings there. They're paid. Now, there's no tax, no benefit information that's pled. Just simply they're paid by the Hamilton Board of Education. And the second is that the board assigns the time, game, and location. Not who's assigned to those games, not which referee, not what level, just simply the times, dates, and locations. And there may be, and I guess that's what you're contending, there may be individual contractors. But again, we're only looking at a 12b-6 dismissal based on the second complaint. Why wouldn't that get us to, if not a question of fact, a mixed question of fact and law, as to whether or not they're employees or independent contractor. He's alleging school boards, the regular season games, they pay. And they assign the games. It's the postseason, it's the New Jersey organization that does that. Exactly right. And why wouldn't that be sufficient just on the pleadings, unless we're back into the old days of the ancient notice, beyond notice pleadings, and something more specific. And the court, even in Iqbal and Trombi, said they weren't going there. They're still relying upon basic notice pleading. I'm having trouble finding out why that's not sufficient. Yeah, and I think a couple things there, Judge. And that's why I mentioned following plaintiff's argument that we've gone all the way through discovery. They've had the opportunity now, if there were additional facts to come in here, beyond what was pledged in that second matter of complaint, to say that there is this employment agency or that Hamilton Board is an employer. They did not do so. So you're suggesting the court should have maybe converted this to summary judgment and handled it that way? Well, I think, you know, taking that question to its logical end, Your Honor, if this court were to remand, say back to the district court, discovery is complete at this point. You're looking at a summary judgment motion practice then. And, you know, likely the same result in terms of dismissal here, because the facts are out there. And the facts are before this court in terms of what's available as to the employment agency and the employer. Like I said, we just have those two things, paid and date, time, location. What more would they need to get from independent contractor to employee other than writing out the paycheck and dictating where they're going to work? Right. There's got to be some more level of control in terms of either the assignments themselves, and obviously, like I said, Board 183 is pled only as an employment agency or not an employer, but the assignments, providing the training, providing the evaluation. And if you view Hamilton as the employer, then that doesn't help you, because Hamilton's making the assignments, aren't they? No, the Board makes the assignments. Okay, the Board makes the assignments. That's why they're an agency. Check is written out by the employer, i.e., Hamilton School District. And go ahead with what you're saying. Help me with that. Well, I'll go one further. The Board also assigns referees to other entities like the YMCA. So taking plaintiff's argument to say that you automatically become an employee of these school boards. It's also saying anybody, any other entity that IBO assigns referees to, the YMCA and the like, are also now employers for purposes of liability under Title VII. And that just can't be. None of these entities have that type of control. Well, that's what I'm trying to get at. You say that type of control. What's the that in that? I think, like I said, the assignment of the actual referees, which, again, no question, does that here. Evaluation of the referees, provision of equipment, provision of training. Again, I think you have to have more than just two of those Darden and Kellum factors here to show that there is a true employer-employment relationship here, where there is that level of control over the means and manner of the employment itself. We just simply do not have that here, Your Honor. Okay, Mr. Watson, thank you very much. Thank you all. Thank you, Your Honors. May it please the Court. I'm Steve Goodell. I am the attorney for the New Jersey State Interscholastic Athletic Association, the NJSIAA. Are you a state entity? We are not. We are a voluntary association. We are a 501c3 nonprofit corporation with our own independent bylaws, rules, and regulations. Our interaction with the state is that there is a state statute which permits public school districts to join voluntary associations such as ours to help them regulate sports. Isn't there also a state policy of no discrimination against women? There's obviously a policy, yes. And I think, Your Honor, to get to your implication about the all-boys network, I can tell you right off the bat that the state tournament that we're talking about, that's the postseason. The postseason. The state tournament is what we take ownership of. The state tournament that Mr. Zitucci has talked of and has been played was run through almost the entire state tournament period that Ms. Covington has been an official by Carol Parsons, who was a woman. Did she appoint women? Well, that's an interesting question. And Your Honor's had questions about the extent to which women officials are out there. Yeah. Over boys' games. From my knowledge, it's been an evolving process. That there are women officials. You mean if I get more gray hair and wait long enough, I'll see women? There are women officials. There are women officials who are certified by IBO. There are women officials who are members of Board 193. Well, they have to be certified by IBO because they perform official services for women's games. Women's high school. There are many different officials' associations in the state of New Jersey. And the way the NJSIAA operates, it has an obligation to provide a pool of qualified officials for its schools. That's its obligation. So that its member schools, when they host games or when they contract with other schools or with their leagues for games, can go to a group of officials and know that those officials are going to be qualified. So that's the underlying issue here. Board 193 is one of those groups. Board 193 is affiliated with IBO. That's how they get their official training. There are other such groups throughout the state in every sport. In basketball, there's an interesting situation because there are several associations, which are specifically women's associations. Women officials have congregated together to create their own officials' association because they have an interest primarily in officiating girls' games. Mr. Titucci may argue they've done that because the door is closed to officiating men's games. So they figure, well, look. Well, that's what he says. I don't think there's any well-plaid complaint that says that. And it's not true. Board 193 is one of those groups that is integrated. It's not a strictly men's association or a strictly women's association. It has both, and it has assigned women to boys' games as well as to girls' games. Can I ask you the end question? Do you know out of the universe of women who have been qualified to officiate games by your association, by your client, what percentage, and I guess the association wouldn't, the affiliation, I'm sorry, the qualification wouldn't come from you but from iBuild. Correct. Within the pool that you're dealing with for your assignments and your games, I guess we're talking only pool season, what percentage of them are females? Any idea at all? There is a small percentage of females. There is a larger percentage of females who are officiating female games, girls' games. And we had litigation years ago by a group of women officials saying that the men were intruding on what they thought was their turf at that time. But there was testimony from Carol Parsons, and she was asked the question, why aren't there more women officials? And Carol said, and she'd been a basketball coach, she'd been running the tournament for years, and she said, we wish there were more. But quite frankly, the best ones move up very quickly, and they go to college. And you may not see them at college men's games, but they are certainly officiating college women's games. Yeah, I haven't, I don't get it. I don't think I've ever seen a woman official refereeing a college men's game. And I do watch that, especially in March when I can't get me away from the TV set. I've never seen a woman official in a college men's game. And NCAA may have one or two, but quite frankly, that is a very, the tournament is very competitive. And what Ms. Parsons said was, when asked that question, she said, we would love to keep more of them, but they move up very quickly. And if they are good, they're officiating college. Do they move up because they're paid more? The pay is the same. Well, the pay in college is better. Yes, the pay in college is better, and that's where people would rather be. The pay for women officials in New Jersey is exactly the same as that for men, whether they are officiating a boy's game or a girl's game. What is the pay? It can't be too much. It can be in the range of $70 to $90 a game. We don't get that for sitting. And then if you can do a JV game beforehand, you can come out okay. But I've got my red light now. But I think what I really wanted to say was that in terms of the NGSIAA, there are two chief complaints against this. One is that we are responsible for what Board 93 does in an agency capacity. And second, that we ourselves discriminated because of our actions in the postseason. And what I quickly want to say is that in terms of the agency argument, that is lifted wholesale from the Kemeter case. In other words, and Mr. Stuckey has said that. But if you look at his pleadings in his second amended complaint, he has pulled out of the Kemeter case all of those facts that he thinks he can prove that would establish what he says is an agency relationship. However, what I'm here to say is that Kemeter is different, and the PIAA and its organization is completely different than the NGSIAA. Yeah, I was going to ask you that. From what I can gather from the Kemeter case, and I can go through in the reply brief that Mr. Stuckey wrote, he specifically cites on pages 15 and 16 several provisions of the Kemeter decision, which he says should be applied in this case as well. It was the conclusions whereby the court could say that there was sufficient evidence before the jury to conclude that the board and the state association were really one and the same for the purposes of assigning. Now, where we differ is first, unlike in Kemeter, we have absolutely no policy, written or otherwise, precluding women from officiating boys' games. In Pennsylvania, there was. That was the case in Kemeter. And second, the NGSIAA, like IBO, has no role in assignments. We do not assign officials, other than to our own tournament. But for the regular season, it's up to the schools to determine where their assigners are going to come from. I think he's just focusing on post-season play for his cause of action against you. Actually, no. No, he's not. For his cause of action against me, he says not only for post-season play, we may have our own assignments. Against your client, not against you. That's correct. I identify with him. But for the regular season, that the actions of IBO have to be attributed to us, or excuse me, of Board 1A3, have to be attributed to us, because, in effect, we have an assignment function which we have delegated to them and which they then are doing on our behalf. However, when you look at what the Kemeter decision says about the way the officials' associations are organized in Pennsylvania, they are different. Their charters are assigned by the Pennsylvania Association. The Pennsylvania Association has the power to dissolve those entities. It's as though they were part of that association. PIAA writes the rules and regulations and bylaws of the association. We do not. It says PIAA has assigned officials in certain circumstances. There is no pleading, and there's no fact, that we have ever assigned an official during the regular season. Where do you think the discrimination comes in? Where is that? That's when you start beating your wife. Against us, against the NJS IAA, the only allegation of discrimination in the postseason is the final pleading in the section, which I would say is the exact kind of conclusory pleading which Iqbal Twanle rejects, which says that NJS IAA is responsible under Title VII for discrimination because it has systematically excluded women from the postseason tournament. That's it. So the question is, what's systematic? There is no fact that's pled that says how or why we have systematically excluded women. Now, in Kemeter, we knew. They had a policy. You can't, you know, don't evaluate women for boys' games. Don't assign women to boys' games. We have no such policy, and none has been alleged. So all he's got in terms of that discrimination is that loan allegation, which I think falls exactly under the Iqbal Twanle standard and should be rejected. Have you assigned women officials to boys' postseason games? We have not. We have not. That's a fact. We have, but what I would say is that there is an extensive process for identifying officials, and that was described in discovery where there are people out looking for officials and making lists constantly of officials that they think are good. There are recommendations from all of the boards throughout the state. There are recommendations from schools. And then there are also actual forms that these observers are supposed to fill out saying, tell us any minority officials or new officials you think ought to be given another look. Do you think women are less qualified? I'm sorry? To be officials? Do you think women are less qualified? Absolutely not. However, I think there would be. I'm sure you wouldn't say that. However, there may be an issue in this case as to whether this particular woman is well qualified to officiate. I've been coaching for 10 years. I mean, her. I think there may be a fact as to whether this. Objectively, she looks perfectly qualified from my standpoint, less than five feet. Officiating in the postseason is competitive, just like the teams who make the postseason. It's a competitive issue. Only the best teams make it. And NJSI has a process which attempts to identify only the best officials to officiate in that tournament. Well, I hope so.  Okay. Thank you. Thank you. Good morning, Your Honors. May it please the Court. Casey Langel on behalf of Hamilton Township Board of Education. I think the counsel for Board 193 thoroughly addressed in both his papers and his argument the employment relationship between my client and Ms. Covington. But I'd like to add just an additional perspective in that regard. When boiled down, all the complaint says with regard to the employment relationship is that a handful of nights a year, Ms. Covington would be assigned to Hamilton and some other schools. She had the right to turn those assignments down or not turn them down and show up. When she showed up, she would referee a game for a couple of hours, get cut a check by the school, and go home. I think under the Iqbal Twombly standard, there's not enough there to establish an employment relationship. Why wouldn't the fact of your client being one who cuts the check, why wouldn't that be enough to at least survive dismissal? Because of how thorough Darden is. Darden's got a long, long list. And there's a long list of things that could have been pled. And all that was pled was that a check was cut. Everything else that's pled is just summary. It's conclusory and there's no meat to it. The fact that somebody cuts a check, I don't think on the face of the complaint, should survive the thorough employer-employee relationship case law that we have. I think that we've covered that. If you have any questions, I'd be happy to answer them. What do you think they should have pled to make out a cause of action of your client being an employer? What should they have added? Anything that they'd present at summary judgment to survive that motion. And I think it's important, you asked a procedural question earlier, Judge McKay, should the district court have converted this? While he didn't convert it, what he did was he issued an order to show cause. So these motions to dismiss were pending. And while they were pending, he issued the order to show cause. In response to that order to show cause, plaintiff showed up with his complaint after almost a year of discovery. He could have shown up with anything at that point to have survived. He didn't. What would have been sufficient? I would submit nothing, having sat in depositions and read all the documents. I know they're not before the court, but they were at plaintiff's disposal back in response to the order to show cause. And he didn't bring them up. I'm in a slightly different position than the rest of the defendants with regard to the Title IX claim. And while they do overlap, I think that they are in and of themselves deficient on their face. Why? Take a look at the complaint. Paragraphs 100 through 107 address my claim. And they are nothing more than naked, bald assertions that Hamilton was capable of reviewing referees and that they participated and colluded in a discriminatory policy with Board 193. They don't say whether reviews were made of Ms. Covington that were bad, whether we intentionally asked for Ms. Covington to not be assigned to our games. It's not pled that we did anything discriminatorily other than that we discriminated. And on the face of the complaint — Well, you didn't select her. That's what's pled, right? That's not up to us, admittedly, in the complaint. You asked the question earlier, where was the discrimination? And counsel's answer was that the discrimination took place with the assigners and Board 193. Well, doesn't the school also have a role in — Regular season. Yeah. All schools can fill out evaluations of referees, both good and positive. Again, this was all borne out through the course of discovery. And I'd submit that if we end up back in the district court, there's nothing there. And if there was something there, I'd imagine we would see it even here, or we would have seen it at the order to show cause. But even on the face of the complaint, all that's alleged is that we were capable of doing evaluations. They don't even go the next step to allege that we performed negative evaluations of female referees on purpose and intentionally selected them to not be assigned to our games. It's not there. And so without that, I don't think it survives at Baltimore. I ask that you deny his application. Thank you, Mr. McDonough. Is there a summary battle? Judge, I want to correct a few things on the record. The argument that you just heard by Mr. Casey and Mr. Watson about what we — I can't hear you. I'm sorry. I just want to correct the record about what we in fact alleged, the specific facts that we alleged with respect to the employment relationship of Hamilton and — Yeah, can you respond to Mr. Langley's last comments? Right. We allege that the school district directly pays the basketball officials, that the school district sets the time, date, location of the games where the official works, that the game takes place and are hosted at the schools, that the schools do in fact evaluate the officials, including Ms. Cunnington. The schools can determine whether they want particular officials working for them or not. And running athletic programs in basketball games are part of the school's business. Part of their business or part of what they do is run athletic programs. Also, the officials themselves have no control over what games they referee, apart from alerting the signer of general availability. Those are eight or nine factors, specific facts that we allege in our complaint. And those were precisely the same factors in the Chemether case as to why the court sustained the jury's verdict that Ms. Chemether was an employee of the school districts in that case. All right. Counsel is correct that said that I read Chemether carefully. I did. All right. I wrote, I looked specifically at what the court said were the dardened factors that supported the jury verdict in that case. And all of those factors are pled, well pled in this complaint because they apply. But you didn't allege that the school or the Hamilton district hired your client. Well, Judge, when we say that they're an employer, we mean hired. I read that somewhere in the district court's opinion. But I think that was really a question of semantics. I mean, the clear, I mean, we specifically say numerous times in our amended complaint, second amended complaint, that the school district is an employer of officials. And we set forth why. And those same factors, the dardened factors, all right, have already been held, all right, by a jury and sustained by a judge to a verdict of discrimination under Title VII. The only other point that I want to make is counsel made an argument that I should have presented, I guess, deposition testimony and documents in the response of the order to show cause, all right. My understanding of the order to show cause was strictly that it was based on the pleadings itself. And I think the judge understood it that way, too. So that's what we're asking for, all right, is the opportunity to present the deposition testimony, all right, to the court ultimately on a summary judgment motion and then ultimately to a jury, all right. And the other one final point, there's been some factual arguments made that Board 193 has assigned women to men's basketball games. And Your Honor has asked. I didn't mention that. Yeah. Your Honor has asked, well, how much? We already know that the NJSA, the New Jersey Association, does not assign a single woman to a men's basketball game for post-season games, all right. The number of times that the Board, Board 193, has assigned women to men's games for the regular season, you can probably count on one hand, all right. You said probably. Yeah. Is it the same female officials getting assigned? There's one in particular that's been assigned several times, all right. She's an incredibly good official. Is it true that Ms. Covington was assigned a couple of men's boys games? She was assigned once or twice after this lawsuit has been brought, all right. And the other assignments also, I think, almost all of them are subsequent to this lawsuit being brought. That's all. Thank you, Judge. Thank you. Again, thank you both sides for offloading. We'll take the matter under consideration. Mr. Lankford, is this your first time arguing? It is.